Argued and submitted February 8, reversed and remanded in part; otherwise affirmed December 15, 1993, Globe's reconsideration and Underwriters' reconsideration denied February 9, both petitions for review denied March 1, 1994 (318 Or 458)

# RANGER INSURANCE COMPANY,
*Respondent,*

*v.*

# GLOBE SEED & FEED COMPANY, INC.,
an Idaho corporation,
*Appellant,*

*and*

# UNDERWRITERS AT LLOYD'S LONDON,
an unincorporated association,
*Respondent.*

(9101-00670; CA A74944)

865 P2d 451

H. Lee Cook argued the cause for appellant. With him on the briefs were Jan D. Sokol and Stafford Frey Cooper & Stewart.

Donald Templeton argued the cause for respondent Ranger Insurance Company. On the brief were Thomas H. Tongue and Dunn, Carney, Allen, Higgins & Tongue.

Jeffrey V. Hill argued the cause for respondent Underwriters at Lloyd's London. With him on the brief were Bradford H. Lamb and Zarosinski & Hill.

Before Warren, Presiding Judge, and Edmonds and Landau, Judges.

LANDAU, J.

Warren, P. J., concurring in part; dissenting in part.

## LANDAU, J.

Ranger Insurance Company (Ranger) filed this action for reformation of its insurance contract with Globe Seed & Feed Co. (Globe) and for a judgment declaring that Ranger has no duty to defend or indemnify Globe for a claim filed against it by the U.S. Forest Service (Forest Service). Globe counterclaimed for breach of contract against Ranger and for a declaration that Ranger has an obligation to defend or indemnify. Globe also filed a third-party complaint[1] against Underwriters at Lloyd's London (Lloyd's) for indemnification.

After various motions for summary judgment and partial summary judgment, the case went to trial without a jury. The trial court found against Globe on all claims, and Globe appeals. We affirm in part and reverse in part.

Globe is a family business that mixes and sells seeds. Lawrence McElliott is its president and is generally responsible for procuring Globe's insurance. Beginning in 1984, Globe employed David Werbeck as its insurance agent. Werbeck advised McElliott about what types of insurance to purchase and what insurance was available on the market. Together, McElliott and Werbeck annually reviewed Globe's business needs and filled out insurance application forms.

Among the insurance policies that Werbeck obtained for Globe was a general liability policy from Ranger. The policy covered "property damage," which was defined as

"a. Physical injury to tangible property, including all resulting loss of use of that property; or

"b. Loss of use of tangible property that is not physically injured."

Beginning no later than January 30, 1987, Globe's policy with Ranger included a seed liability exclusion that provided:

"This insurance does not apply to 'property damage' arising out of:

"1. Failure of seed to germinate;

"2. Erroneous delivery of seed; or

---

[1] Although Globe's pleading is captioned "cross-claim," its substance is more properly characterized as a third-party complaint.

"3. Error in mechanical mixture of seed."

When the Ranger policy came up for renewal for 1988, Werbeck met with McElliott to review the application. Werbeck also completed and submitted an estimated exposure form, which acknowledged the seed liability exclusion. On the basis of that application, Ranger renewed the liability policy effective November, 1987 (1988 policy). That policy contained the seed liability exclusion.

When the policy came up for renewal again in November, 1988 (1989 policy), Werbeck and McElliott followed the same application process. The application again acknowledged the exclusion. The 1989 policy that was issued, however, did not include an endorsement for the seed liability exclusion, although the policy declaration page referred to seed merchant coverage as "excluding Misdelivery, Error in mixture and Germination failure." At trial, Ranger presented testimony that the absence of the seed liability exclusion endorsement was due to an error that occurred when Ranger revised its coding system.

Globe renewed again in November, 1989 (1990 policy), following the same application and renewal process. The 1990 policy also did not include the seed liability exclusion. This policy did not mention the exclusion on the declarations page.

In early 1990, Ranger's underwriting department learned that it had failed to include the seed liability exclusion in the 1990 policy and, on March 23, 1990, Ranger issued an amendatory endorsement, retroactively adding the exclusion to the 1990 policy. The endorsement was forwarded to Werbeck, who forwarded it to Globe. Ranger did not receive a response from Globe. In November, 1990, Globe renewed again. The new policy contained the exclusion.

Werbeck also purchased for Globe "seedsmens errors and omissions insurance" coverage from Lloyd's. The coverage was effective during all of 1989 and part of 1990, in addition to other years. The Lloyd's policy covered "any claim * * * [f]or failure of the seed sold by [Globe] to conform to the variety or quality specified or to be suitable for the purpose specified." Exclusion (e) of the policy excluded claims "[f]or damage to or destruction of the property of any person."

In 1988, Globe sold a grass seed mixture to the Forest Service. The seed was sewn in October of that year, to provide erosion control after a forest fire. In October, 1989, the Forest Service notified Globe that the seeds had produced an infestation of yellowstar thistle, a noxious weed. In December, 1989, the Forest Service billed Globe for eradication costs, and notified it that further eradication would be needed in later years. The Forest Service then filed a claim against Globe to recover its expenses (Forest Service claim).

Werbeck notified Lloyd's of the Forest Service claim. Lloyd's denied coverage, relying on exclusion (e) of its policy. Lloyd's contended that the claim was for damage to the property where the grass seed had been planted. Werbeck then notified Ranger of the Forest Service claim.

Ranger's adjuster determined that the loss occurred in late October, 1989, so that the 1989 policy was in effect. Unaware of the error in the 1989 policy, the adjuster sent a reservation of rights letter advising Globe of two possible policy defenses: (1) untimely notice, and (2) that the claim may not constitute the kind of "property damage" that was covered by the policy. Ranger also recommended that Globe hire its own attorney at its own expense to defend against the Forest Service claim. Globe did that, while maintaining that the infestation was property damage.

On August 23, 1990, the adjuster sent a letter to Globe stating that the claim did constitute the type of property damage that was covered by Ranger's general liability policy, and that Ranger withdrew its reservation of rights. Ranger then assumed control of the case and paid legal expenses and costs that Globe had incurred.

In October, 1990, Ranger's underwriting department became aware that the 1989 policy had erroneously omitted the seed liability exclusion. On December 20, 1990, Ranger issued a new reservation of rights letter to Globe. Ranger continued to defend the Forest Service claim under the new reservation of rights.

In January, 1991, Ranger filed this action against Globe, for reformation of its 1989 policy to include the seed liability exclusion and for a declaration that it had no obligation to defend or indemnify Globe for the Forest Service

claim. Globe answered, asserting waiver and estoppel as affirmative defenses. It counterclaimed for breach of contract and for a declaration that Ranger was obligated to defend and indemnify. It also filed a third-party complaint against Lloyd's for a declaration that Lloyd's had a duty to indemnify for any sums recovered by the Forest Service against Globe.

In July, 1991, Wallane Corporation, a private land-owner whose property adjoins the area seeded by the Forest Service, filed a separate action against the Forest Service for infestation of its property with yellowstar thistle. The Forest Service filed a third-party complaint against Globe for indemnification or contribution. Globe tendered defense of the claim to both Lloyd's and Ranger. The former denied coverage and the latter assumed defense under a reservation of rights. Ranger then amended its complaint to include coverage and defense of the Wallane claim.

Ranger and Globe made various motions for partial summary judgment and summary judgment on the issues of contract construction and reformation, including Globe's defenses on the theories of waiver and estoppel. The court denied all of those motions. Globe and Lloyd's filed cross-motions for summary judgment, which the court also denied. Lloyd's also moved for partial summary judgment on the Wallane claim, because that claim was made after the policy had expired. The court declined to rule on that motion until after trial.

Ranger filed a second motion for partial summary judgment dismissing Globe's counterclaims for breach of contract and attorney fees and declaring that Ranger had no duty to defend or indemnify Globe under any policy other than the 1989 policy. The trial court granted that motion.

During trial, after the presentation of Ranger's case, Globe moved for dismissal under ORCP 54B(2), arguing that Ranger had presented insufficient evidence for reformation. The court denied the motion. At the close of Globe's case, Lloyd's moved for a directed verdict on the ground that Globe's claim was not covered because it constituted liability for "property damage."

After trial, the court issued a letter opinion, allowing reformation of Ranger's insurance contract by adding the

seed liability exclusion, rejecting Globe's defenses of waiver and estoppel and holding that Globe's claims were not covered by the Ranger policy. The court also held that Globe's claims were not covered by the Lloyd's policy, because the property damage exclusion applied. The court granted Lloyd's motion for partial summary judgment on the Wallane claim. The court then entered a final judgment in favor of Ranger and Lloyd's, disposing of all issues as to all parties.

The court held that Idaho law applied to all of the claims. None of the parties challenges that ruling.

We first dispose of Globe's assignment of error to the trial court's denial of its motion for summary judgment against Ranger on the claims for reformation. In an appeal from a judgment after trial, the denial of summary judgment is not reversible, unless the motion was based on purely legal grounds that are independent of any factual issues. *Payless Drug Stores v. Brown*, 300 Or 243, 246, 708 P2d 1143 (1985). The reformation claim depended on material issues of fact that were litigated at trial. Therefore, we will not reverse the denial of summary judgment on that claim.

We next address Globe's assignment of error to the trial court's denial of its motion to dismiss Ranger's claim for reformation. ORCP 54B(2). Motions under ORCP 54B(2) are to be "sparingly granted." *Castro and Castro*, 51 Or App 707, 713, 626 P2d 950 (1981). Only in an "unusually clear case" should a trial court dismiss a nonjury action before the close of all the evidence. *Federal Deposit Ins. Corp. v. Tempest Fugat*, 75 Or App 536, 541, 707 P2d 81 (1985), *rev den* 300 Or 546 (1986). In reviewing the trial court's decision to deny a motion to dismiss under ORCP 54B(2), we consider the whole record to determine whether there was evidence sufficient to make out a *prima facie* case. *Scholes v. Sipco Services & Marine, Inc.*, 103 Or App 503, 506, 798 P2d 694 (1990); *Jordan v. Rask*, 66 Or App 720, 723, 674 P2d 1211 (1984).

Ranger's claim for reformation was premised on its assertion that its underwriting department made a scrivener's error in drafting the 1989 and 1990 insurance policies by omitting an exclusion to which the parties had agreed. Idaho law generally permits reformation of a contract to correct a scrivener's error, even if the error was negligently

made. *Suitts v. McMurtrey*, 97 Idaho 416, 417, 546 P2d 62 (1976); *Aitken v. Gill*, 108 Idaho 900, 902, 702 P2d 1360 (Ct App 1985). Similarly, a mutual mistake by parties to an insurance contract can provide the basis for reformation, if the person seeking the equitable remedy proves by clear and satisfactory evidence that the parties "share[d] a misconception about a basic assumption or vital fact upon which they base[d] their bargain." *Mutual of Enumclaw Ins. v. Wood By-Products*, 107 Idaho 1024, 1027, 695 P2d 409 (Ct App 1984).

■ The evidence was sufficient to establish Ranger's *prima facie* right to reform the 1989 policy to include the exclusion. Globe's 1988 policy contained a provision excluding coverage of liability for property damage resulting from seed errors. There was evidence that Globe applied for a policy containing that exclusion when it requested renewal for 1989. The omission of the clause apparently was unintentional and was the result of an error made during Ranger's revision of its coding procedure. Globe produced no evidence that it intended to purchase a policy from Ranger that covered liability for seed errors. In short, there is evidence that the parties intended the exclusion to be in the contract at the time the contract was made.

■ Globe argues that, even if Ranger made out a *prima facie* case for reformation, it was nevertheless entitled to dismissal, because the evidence is undisputed that Ranger had waived its right to enforce the exclusion when it withdrew its reservation of rights and undertook Globe's defense. According to Globe, it is estopped from asserting the exclusion now. At the outset, we note that Ranger never withdrew its reservation of rights with respect to the Wallane claim. Therefore, we address Globe's waiver and estoppel argument only as it concerns the Forest Service claim.

■ Because of our limited standard of review of the trial court's denial of Globe's motion under ORCP 54B(2), we will reverse only if the evidence in support of its waiver or estoppel defense is, indeed, undisputed. For Globe to prevail on either theory, it must demonstrate that it relied on Ranger's conduct and that its rights were prejudiced by that reliance. The elements of equitable estoppel are:

"(1) a false representation or concealment of a material fact with actual or constructive knowledge of the truth, (2) the

party asserting estoppel did not know or could not discover the truth, (3) the false representation or concealment was made with the intent that it be relied upon and (4) the person to whom the representation was made or from whom the facts were concealed, relied and acted upon the representation or concealment to his prejudice." *Theriault v. A.H. Robins Co., Inc.*, 108 Idaho 303, 307, 698 P2d 365 (1985).

Similarly, waiver is an intentional relinquishment of a known right or advantage that is not binding until the adverse party relies on the waiver to its detriment. *Brand S Corp. v. King*, 102 Idaho 731, 734, 639 P2d 429 (1981). Assuming, without deciding, that Idaho law permits waiver and estoppel to prevent exclusion of coverage in an insurance policy, Globe has failed to demonstrate that it suffered any detriment as a consequence of Ranger's conduct.

After it was notified of the claim, Ranger sent Globe a timely reservation of rights letter and did not undertake defense of the claim. On Ranger's advice, Globe hired a lawyer to handle the case. Four months later, when Ranger withdrew its reservation of rights, Ranger assumed control of the case. There is no evidence that there was any change in the way the case was handled when Ranger assumed control. After another four months, Ranger sent a second reservation of rights letter, but continued to conduct the defense of the case.

There is no evidence of any actual prejudice to Globe. Globe initially controlled its own defense and chose the law firm and the defense strategy that was in progress when Ranger took control. The period of time during which Globe believed that Ranger would defend the claim was only four months. Globe's temporary loss of control, by itself, is not evidence of prejudice, and there is no evidence that Ranger made changes in the choice of counsel or the strategy. Because there was no evidence that Globe was prejudiced by Ranger's assumption of the defense, Ranger's conduct did not deprive it of the right to reform the contract, and the trial court did not err in denying Globe's motion to dismiss under ORCP 54B(2).

We next turn to Globe's assignment of error to the court's decision to grant Ranger's motion for partial summary judgment on Globe's counterclaim for breach of contract. Ranger had argued in its motion that, even assuming

that the 1989 and 1990 policies do not contain the seed liability exclusion, Ranger had no duty to defend or indemnify Globe and, therefore, could not be found liable for breach of contract and for payment of attorney fees. We need not decide whether the trial court erred in granting Ranger's motion, because it later concluded after trial that Ranger was entitled to reformation of its policies and that, on the basis of that reformation, Ranger had no obligation to Globe for damage arising out of improper seed mixing. Globe does not assign error to the trial court's findings and conclusions. Therefore, the issues raised in the partial summary motion are moot. *See Smith v. Hawkins*, 84 Or App 336, 341, 733 P2d 929 (1987).

Globe's evidentiary assignments of error with respect to Ranger do not require discussion.

Globe also assigns error to the trial court's ruling that, as a matter of law, the Lloyd's "seedsmens errors and omissions insurance" policy does not cover any liability for the costs of weed eradication that resulted from the improper mixture of grass seed.[2] The policy expressly covers "any claim * * * [f]or failure of the seed sold by [Globe] to conform to the variety or quality specified or to be suitable for the purpose specified." Globe argues that it is undisputed that the seed it sold did not "conform to the variety or quality specified" and was "unsuitable for the purposes specified," and, therefore, the claims arising out of the sales to the Forest Service should be covered. Lloyd's argues that the Forest Service's claim arising from weed infestation is a claim for property damage and, therefore, is subject to exclusion (e) of the policy, which excludes "damage to or destruction of the property of any person." Globe contends that the exclusion unambiguously does not refer to damage resulting from weed infestation. In the alternative, it argues that the language of the exclusion is at least ambiguous and, consequently, must be construed against the insurer. Lloyd's and the dissent regard Globe's arguments as "untenable," first because Globe asserted that the Forest Service claim did constitute "property damage" under the Ranger policy, second because its construction is inconsistent with cases in which environmental damage was held to constitute "property damage," *see, e.g., AIU Ins. Co.*

---

[2] Globe does not challenge the trial court's ruling on Lloyd's motion for partial summary judgment on the issue of liability for the Wallane claim.

*v. Superior Court*, 51 Cal 3d 807, 274 Cal Rptr 820, 799 P2d 1253 (1990), and, third because the policy on its face was intended to cover only economic injuries such as crop losses.

We begin with whether the language in exclusion (e) is ambiguous. Under Idaho law, a contract provision is ambiguous if it is susceptible of more than one reasonable construction. *Burgess Farms v. New Hampshire Inc. Group*, 108 Idaho 831, 834, 702 P2d 869 (Ct App 1985). Here, the exclusion of "damage" to or destruction of "property" of any person reasonably could mean what either party asserts it means. We are not persuaded by Lloyd's and the dissent's arguments to the contrary.

First, merely because Globe had conceded that the Forest Service claim constituted "property damage" as that term was defined in the Ranger policy does not mean that the claim must also be considered "damage to or destruction of the property of any person" under exclusion (e) of the Lloyd's policy. The meaning of unambiguous language in a contract should be clear without reference to extrinsic evidence, such as the construction of terms used in other contracts. *See, e.g., Parma Seed, Inc. v. General Insurance Co. of Amer.*, 94 Idaho 658, 496 P2d 281 (1972). Moreover, words in one contract may mean something entirely different in another contract, and that is particularly so in the case of different insurance policies that have been negotiated by different parties for entirely different purposes. *Compare Foster v. Johnstone*, 107 Idaho 61, 685 P2d 802 (1984) ("regular use" in a family automobile policy held unambiguous) *with Moss v. Mid-America Fire and Marine Ins.*, 103 Idaho 298, 647 P2d 754 (1982) ("regular use" in a policy insuring trucks for commercial hauling held ambiguous). In this case, the term "property damage" is expressly defined in the Ranger policy. That definition extends the meaning of "property damage" to include not just physical injury to property, but loss of use of that property as well. The Lloyd's policy, in contrast, contains no such broad definition; it contains no definition of "damage to * * * property" at all. There is no reason to assume that Globe and Lloyd's intended the definition of "property damage" in the Ranger policy to be incorporated into the Lloyd's policy. In fact, the purposes of each agreement suggest the contrary. The purpose of the Ranger policy was to cover

liability for losses *other* than those resulting from improper seed mixtures; Lloyd's policy was to cover liability *only* for improper seed mixtures. Globe's purpose for purchasing both policies was to cover two different kinds of liability, not to duplicate coverage. Thus, there is no basis for Lloyd's and the dissent's assertion that the term "property damage" in the Ranger policy must, as a matter of law, be equivalent to the term "damage to * * * property" in exclusion (e) of Lloyd's policy.

Second, although Lloyd's and the dissent's asserted analogy to pollution cases is a reasonable one, it is not without problems; other analogies are at least equally compelling. Lloyd's and the dissent reason that, because weed infestation is like pollution, the policy plainly excludes Globe's claim as well. In pollution cases, however, there is actual damage to the land or to property that is situated on the land. An infestation of weeds, by itself, does not damage anything. A weed is merely a plant that grows from a seed, like any other. Losses that result from injuries to animals that eat the weeds might be property damage, but the cost of removing weeds is not a loss that is the consequence of damage to the soil or to any other property. It is merely the consequence of planting seeds that fail to conform to the variety specified. In that regard, a claim for losses that result from growing unwanted weeds is at least arguably the same as a claim for losses that result from growing unmarketable agricultural crops, which has been held not to constitute "property damage." *See Hardison Seed Co. v. Continental Casualty Co.*, 56 Tenn App 644, 410 SW2d 729 (1966), *cert den* (1967). Both kinds of plants fail to provide the seed purchaser the intended benefit, and both kinds of plants cause losses that result from their unwanted presence.

Third, Lloyd's and the dissent's contention that the policy was clearly intended to cover only liability for economic injuries such as those that would be based on "crop losses" makes no sense. The policy nowhere mentions anything about limiting coverage to "economic losses," and it says nothing about crops. Moreover, if the policy only covered "crops," then a grass seed grower or distributor like Globe would have little interest in purchasing it, unless a lawn is "grass crops."

 The one thing that is clear from the arguments is that the language of the policy is not clear with respect to liability for noxious weed seeds. Under Idaho law, "the burden is on the insurer to use clear and precise language if it wishes to restrict the scope of its coverage." *Moss v. Mid-America Fire and Marine Ins., supra,* 103 Idaho at 300. Contract exclusions must be strictly construed in favor of the insured. 103 Idaho at 300. Lloyd's failed to define its terms, and its failure to be specific contributes to the ambiguity of the language. *Foster v. Johnstone, supra; Moss v. Mid-America Fire and Marine Ins., supra; Burgess Farms v. New Hampshire Inc. Group, supra,* 108 Idaho at 834. We therefore examine the policy as a whole, construing the language most favorably to the insured, to determine the meaning of the exclusion. IC § 41-182; *Kootenai County v. Western Cas. & Sur.,* 113 Idaho 908, 910, 750 P2d 87 (1988).

 The policy includes Globe's application, which discloses that the vast majority of Globe's seeds sales were grass seed mixtures. A seedsmen's policy would be virtually useless to a grass seed grower if the grower could never recover for liability for plants not intended for harvest. According to Lloyd's, a grass seed grower could not recover for any liability resulting from the delivery of, say, the wrong type of grass seed to a golf course for its putting green, or to a football team for its playing field or to a horse breeder for its pasturage. That construction of the exclusion would eviscerate the policy's coverage provisions, which expressly call for coverage of claims arising out of the delivery of unsuitable seed. As the Idaho Supreme Court explained:

> "[A]n insurance contract is to be construed most favorably to the insured and in such a manner as to provide full coverage for the indicated risks rather than to narrow protection. This court will not sanction a construction of the insurer's language that will defeat the very purpose or object of the insurance." *Bonner County v. Panhandle Rodeo Ass'n, Inc.,* 101 Idaho 772, 776, 620 P2d 1102, 1106 (1980) (quoting *Erikson v. Nationwide Mutual Insurance Company,* 97 Idaho 288, 292, 543 P2d 841 (1975)).

We therefore hold that Globe's claim for its liability for the cost of weed eradication is not excluded as "property damage" under the Lloyd's policy, and the trial court erred in holding otherwise.

Reversed and remanded as to Globe's action against Lloyd's; otherwise affirmed.

**WARREN, P. J.,** concurring in part; dissenting in part.

I agree with the majority regarding its disposition of the dispute between Ranger Insurance Company (Ranger) and Globe Seed & Feed Co. (Globe). As to Ranger, we hold that the policy should be reformed to exclude claims for property damage and that that exclusion results in no coverage under Ranger's policy. Given that, the claim was necessarily one for property damage. The majority takes the untenable position that the loss in this case was property damage under one insurance policy, but not property damage under the other. I disagree, therefore, with its reversal of the judgment for Underwriters at Lloyd's London (Lloyd's) on Globe's third-party claim. Accordingly, I dissent from that portion of the opinion.

Lloyd's "Seedsmens Errors and Omissions Insurance" policy includes coverage

"[f]or failure of seed sold by the Assured to conform to the variety or quality specified *or to be suitable for the purpose specified* by reason of any negligent act, error or omission of the Assured or its employees in the conduct of the Assured's business[.]" (Emphasis supplied.)

The preface to the policy explains that the purpose of errors and omissions insurance is to ensure the reputation of a professional, which is at the "core of his livelihood."

Exclusion (e) of the Lloyd's policy provides that it will not pay sums that Globe shall be legally obligated to pay arising out of any claims for "damage to or destruction of the property of any person." Damage to property is not defined in the policy. Lloyd's argues that the weed infestation was property damage that was repaired by the removal of the weeds from the property, so that the policy does not cover Globe's claim. Although Globe had argued to the trial court that the weed infestation *was* property damage under Ranger's general liability policy, Globe takes a contradictory position here by arguing that the infestation *is not* property damage under the errors and omissions policy exclusion.

Globe argues that property damage is limited to actual physical damage, such as a supplier's truck harming a storage facility. Globe also argues that the exclusion is ambiguous and must be construed against the insurer.

Under Idaho law, when the policy language is clear and unambiguous, insurance coverage must be determined according to the plain meaning of the words employed. *Aid Ins. Co. (Mut.) v. Armstrong*, 119 Idaho 897, 811 P2d 507 (Ct App 1991). The court must determine what a reasonable person in the position of the insured would have understood the language to mean. 119 Idaho at 900. Whether policy language is ambiguous is a question of law for the court to determine. *Foster v. Johnstone*, 107 Idaho 61, 63, 685 P2d 802 (1984). I conclude that the exclusion is not ambiguous and that it excludes coverage for the damage claimed by Globe in this action.

The parties have not cited and I have not found cases in Idaho or any other jurisdiction dealing with the scope of a property damage exclusion in an errors and omissions insurance policy. The Idaho courts have not discussed the definition of property damage in any type of insurance policy.

The cases cited by the parties deal with general liability policies. In that context, a number of courts have construed the undefined term "property damage" to include the broadest coverage for the insured, including crop losses from the diminution of the crop yield. *See, e.g., St. Paul Fire and Marine Insurance Co. v. Northern Grain Co.*, 365 F2d 361 (8th Cir 1966); *Safeco Ins. Co. v. Munroe v. Cogswell Agency*, 165 Mont 185, 527 P2d 64 (1974); *General Ins. Co. v. Gauger*, 13 Wash App 928, 538 P2d 563 (1975). None of those courts held that the undefined term "property damage" was ambiguous.

Lloyd's suggests that, as a reaction to decisions such as those just cited, broadly construing property damage coverage in general liability policies, insurance companies have changed general liability policies to limit the definition of property damage to "tangible" and "physical" damage, so as to exclude coverage for economic losses. *See, e.g., Wyoming Sawmills v. Transportation Ins. Co.*, 282 Or 401, 578 P2d 1253 (1990). It argues that the restriction of property damage

coverage to physical damage in general liability policies leaves intangible damages such as economic loss uninsured, giving rise to the need for errors and omissions coverage to protect against purely economic losses.

Both Globe and Lloyd's rely on *Hardison Seed Co. v. Continental Casualty Co.*, 56 Tenn App 644, 410 SW2d 729 (1966), to support their arguments. The plaintiff had sold green lima bean seeds, which produced a large percentage of the wrong type of beans that could not be sold. The plaintiff was sued for breach of warranty. The general liability carrier argued, and the court agreed, that the insurance policy "Products Hazard" coverage for damages "because of injury to or destruction of property" caused "by accident" did not cover the claim. The court said that the claim alleged was a misrepresentation of quality resulting in an inability to sell the product, a classic breach of warranty case, and not one of accidental property damage.

Globe argues that the infestation in the current case is similar to a crop loss, because both involve the loss of *use* of real property, and that neither is property damage. Lloyd's argues that the loss described in *Hardison Seed Co.* is the kind of loss that errors and omissions insurance is intended to cover: a customer's business loss because the goods delivered were of less than the quality warranted. Lloyd's argues that that kind of loss *did not* occur in this case.

I find Lloyd's analogy to damage caused by pollution helpful. In *AIU Ins. Co. v. Superior Court*, 51 Cal 3d 807, 274 Cal Rptr 820, 799 P2d 1253 (1990), the California Supreme Court held that liability for cleanup of hazardous wastes from disposal sites, the groundwater beneath the sites, the aquifers beneath adjoining property and surrounding surface waters was property damage under a standard comprehensive general liability policy. *See also Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F2d 1551 (9th Cir 1991). A similar example of property damage is the effect of methamphetamine vapor permeating porous materials, such as drapes, carpets and walls. *Largent v. State Farm Fire & Casualty Co. (A71495)*, 116 Or App 595, 842 P2d 445 (1992), *rev den* 316 Or 528 (1993). In *Largent*, a general liability insurance policy that limited property damage to "accidental direct physical loss" covered the vapor contamination.

General liability policies ordinarily cover property damage. I am persuaded that the weed infestation in this case would come within the usual property damage coverage of a general liability policy, because it is physical damage to tangible property. Ranger's policy, however, specifically excluded such damage. Globe has offered no reasonable explanation why, in the absence of a definition of the term, the meaning of "property damage" in an errors and omissions policy should be different than that of a general liability policy. It is reasonable that an errors and omissions policy that covers economic loss would exclude the same property damage that is ordinarily covered by general liability policies. It is beyond dispute in this case that neither the insured nor the insurers intended there to be property damage coverage. The question is whether what happened here was property damage. The majority inconsistently concludes it was. I would hold that the term "property damage" is not ambiguous, because in the context of the facts of this case, there is not more than one reasonable interpretation of the words employed in the Lloyd's policy. Therefore, I would affirm the trial court's holding that the Lloyd's policy does not cover the Forest Service claim.